IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| EDUARDO GARCIA, | § | No. 5:25-CV-181-DAE |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | |
| | § | |
| FROST BANK, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The matter before the Court is Defendant Frost Bank's ("Defendant" or "Frost") Motion for Summary Judgment on all Eduardo Garcia's ("Plaintiff" or "Garcia") claims. (Dkt. # 17.) The Court has determined that this matter is suitable for disposition without a hearing. After careful consideration of the memoranda in support of and in opposition to Defendant's Motion, the Court, for the reasons that follow, **GRANTS** Defendant's Motion for Summary Judgment.

BACKGROUND

This case hinges on the chronology of Plaintiff's conduct and Defendant's reprimands of that conduct. Accordingly, the Court will first recount the chronology of Plaintiff's employment with Frost. Proceeding year-by-year, the following section will note both Plaintiff's performance history alongside his

protected conduct (*i.e.*, internal complaints to management, application for FMLA leave, and the onset of his disability), which he contends informed Defendant's actions.

## I. Pre-2020

Defendant hired Plaintiff as a Loan Operation Compliance Manager in its San Antonio, Texas, office on October 3, 2016. (Dkt. # 17-1 at 8.) Plaintiff's primary responsibilities as a Loan Operations Compliance Manager included "ensuring all retail and commercial loan operations are compliant with applicable laws and regulations," as well as "acting as [a] subject matter expert on loan operations compliance related matters." (Dkt. # 17-16 at 2.) The parties do not identify evidence suggesting that, prior to 2020, Garcia had any performance issues, complaints against him, or other disciplinary record. (See Dkts. ## 17; 19.)

## II. 2020–2023

### A. The 2020 Performance Improvement Plan ("PIP")

Approximately three-and-a-half years into his tenure at Frost, Garcia received his first PIP ("the 2020 PIP"). (See Dkt. # 17-6 at 2.) The 2020 PIP was issued by his then-supervisor, Cheryl Watson, and noted several areas for improvement. (Dkts. ## 17-2 at 3–4; 17-6 at 3.) In particular, the 2020 PIP outlined deficiencies in Garcia's (1) performance in "managing the processes within a team/department"; (2) "communication skills"; and (3) "decision

making." (Dkt. 17-6 at 2–3.) After initially refusing to sign the 2020 PIP because he was "not in agreement with [it]," Garcia ultimately signed it.[1] (Id. at 4.)

B. Garcia's Employment Following the 2020 PIP

After the issuance of the 2020 PIP, the summary judgment record does not indicate that Defendant took other action vis-à-vis Garcia. To the contrary, the evidence suggests that Garcia's performance improved. (See Dkt. # 17-2 at 4–5.) At some point thereafter, Loan Operations Manager Shauna Skaggs ("Skaggs") became Garcia's new manager. (Dkt. # 17-1 at 10–11.) In 2021 and 2022, "Skaggs assigned Garcia an overall manager-calculated ration of 4.7 out of 5.0 . . . and 4.73 out of 5.0" respectively. (Dkt. # 17-2 at 4.)

1. Garcia's First FMLA Leave Request (2022)

Garcia applied for FMLA leave in February 2022. (Dkt. # 19-5.) On March 3, 2022, Frost informed Garcia that he was eligible for twelve weeks of unpaid leave across a rolling twelve-month period to care for his elderly mother. (See id.; Dkt. # 17-1 at 32.) Garcia provided documentation about his mother's condition and took the leave without incident. (Dkts. ## 17-1 at 56; 19-5.) The

[1] The Court notes that there is no date alongside Garcia's signature. (See Dkt. # 17-6.) The other parties signed it on January 9, 2020, which is the same date that appears on the top of the document. (Id. at 3.) However, he admits that he signed the 2020 PIP. (Dkt. # 17-1 at 10.)

2022 FMLA leave was estimated to end on or about February 17, 2023. (See Dkt. # 17-1 at 33.)

2. The February 2023 Complaints about Garcia

On February 2, 2023, and then again on February 9, 2023, "Frost Human Resources received reports from a Frost manager that Garcia was making inappropriate advances towards a female employee who was junior to Garcia at Frost." (Dkt. # 17-2 at 5; see Dkt. # 17-1 at 12–13.) Virginia Gonzales ("Gonzales") served as Frost's Senior Vice President, Human Resources Manager during the time periods at issue in Garcia's case. (Dkt. # 17-2 at 2.) In her affidavit, Gonzales attests to her personal knowledge of and involvement in the internal investigation concerning the complaints about Garcia. (See id. at 5.) The complainant, P.G., reported that Garcia "initiated contact with [her] seeking time, attention, and interactions for no business reasons." (Id.)

Frost issued a "Final Written Warning" on February 28, 2023, regarding Garcia's "Inappropriate Relationship." (Dkt. # 17-9.) Madyson Boyd ("Boyd"), Employee Relations Specialist II, and Garcia signed this report on March 8, 2023.[2] Namely, it reflects Frost's "findings . . . that Eddie [Garcia] participated in frequent personal interactions with the [P.G.]" and notes that

[2] The Final Written Warning also contains a signature block for Gonzales, but it does not appear that she signed the physical document. (See Dkt. # 17-9 at 2.)

"[t]hese non-work related interactions blurred the lines between a member of leadership and an employee." (Id.) Additionally, it states that Garcia "did not demonstrate the highest level of integrity by disclosing the full extent of [his] relationship and interactions [with P.G.]" (Id.) The closing paragraph of the Final Written Warning instructs that "any additional complaints of similar nature" would cause immediate termination. (Id.)

Coincidental to the reports of misconduct from Garcia directed toward a junior female employee, Garcia received lower performance evaluations. Frost conducted a Mid-Year Review of Garcia's performance from January 1, 2023, to May 31, 2023. (Dkts. ## 17-2 at 5; 17-10 at 2.) Garcia received a rating of 2.77 of 5. (Dkt. # 17-10 at 2.) Garcia received feedback from Skaggs on twelve different dimensions of his performance, which spanned Frost's three core values of integrity, caring, and excellence. (See id. at 2–4.) Although the Mid-Year Review scored Garcia highly on "Excellence"—indicating that he "encourages teamwork within his team" and "is the first [person] to praise his employees on a job well done"—he received several "2" ratings for "inconsistently demonstrates" across the Integrity and Caring sections. (See id.) Specifically, Skaggs noted that "Eddie 'Listens to Respond' and routinely demonstrates an unwillingness to hear others out before reaching a decision or forming his own response." (Id. at 3.) Relatedly, the feedback Mid-Year Review noted that Garcia "does not admit fault but rather

tries to deflect or blame others." (Id. at 4.) Moreover, Skaggs referenced the "result of [an] HR investigation" and cited it to justify a low rating for Garcia in response to the question: "[Is Garcia] protecting . . . Frost work value while achieving results?" She explained that "it was found that [Garcia] was not upholding Frost's core work values" by "engaging in countless Teams messages with another employee" and indicated that Garcia "should have been cognizant of the fact that this not only impacted his [own] ability to be productive, but also the other employee." (Id. at 3.)

3. Garcia's February 2023 Reapplication (and Approval) for FMLA Leave

Several weeks after Frost received these reports, Garcia reapplied for FMLA leave in February 2023. (Dkts. ## 17-1 at 33; 17-21; 17-22.) Frost re-approved his request in March 2023. (Dkts. ## 17-1 at 33; 17-22.) Garcia's testimony reflects that he then took the FMLA leave "as needed" to care for his elderly mother. (Dkt. # 17-1 at 34.) He did not have any documented disability at this time. According to Garcia, the onset of his disability, anxiety, was September 26, 2023. (See Dkt. # 17-1 at 53.)

4. Mid-to-Late-2023: Garcia's Complaints

Frost terminated Garcia on February 15, 2024. (See Dkt. # 17-1 at 8.) From mid-2023 until his termination, Garcia reported several separate incidents to

Frost Human Resources personnel. (See Dkt. # 17-1; 17-2 at 6–8.) The Court will detail each complaint below.

First, on July 4, 2023, Garcia complained to Frost's Group Executive Vice President and Chief Human Resources, Annette Alonzo ("Alonzo"). (Dkts. ## 17-1 at 37; 19-8 at 1.) In his written complaint, Garcia alleged approximately a dozen instances between February 2023 and June 2023 where Skaggs had "treated [him] unfairly" and "violated" his "rights as a [Frost] employee." (Dkt. # 19-8 at 1.) In response, Alonzo directed Gonzales to investigate because Alonzo was on vacation. (Dkt. # 17-1 at 37.) Gonzales then met with Garcia on July 13, 2023, via Microsoft Teams. (Dkt. # 17-2 at 6.) However, as she attests, "[w]hen asked for specific examples of details regarding alleged harassment, Garcia was not able to provide any specific situations, comments, or conduct that would be considered any form of discrimination or harassment." (Id.; see Dkt. # 17-12 at 2; cf. Dkt. # 17-1 at 38–39 (reflecting Garcia's testimony that he did not recall providing Gonzales with any specific information concerning examples of discrimination during the July 13, 2023, Teams meeting).) Gonzales documented the interviews she conducted with Frost personnel whom Garcia identified in his complaint. (See Dkts. ## 17-2 at 6–7; 17-13 at 2–3.) In her "Findings," Gonzales characterized Garcia's concerns about Frost's upper management selecting Polly Marin ("Marin") for a supervisor role in his department without his approval as stemming

from "secondhand rumors and gossip." (Dkt. # 17-13 at 2.) At his deposition, Garcia could not identify any of the issues with Marin that he had brought to Gonzales. (See Dkt. # 17-1 at 38–39.) The other allegations in Garcia's complaint included, *inter alia*, that he received a message from Skaggs while at a doctor's appointment, he overheard an offensive word in Spanish, a candidate was hired for a position on his team after he requested they be interviewed while he was out of office, and being ignored by Skaggs while she walked through the office one day in May 2023. (See Dkt. # 17-11 at 2–4.) Gonzales avers that interviews she conducted during the investigation confirmed that Garcia was not subjected to "discrimination, harassment, or unfair treatment."[3] (Dkt. # 17-2 at 7.) Gonzales and Boyd met with Garcia on August 23,2023, to share these findings. (Id.) Garcia stated that he understood the findings. (Id.; Dkt. # 17-1 at 39.)

Second, on November 14, 2023, Garcia reported that he had received "an inappropriate music video via TikTok" from Ms. Skaggs. (Dkts. ## 17-1 at 41; 17-2 at 7.) Upon receiving Garcia's report, Gonzales reviewed Skaggs's Frost-issued phone "without giving [] Skaggs prior warning." (Dkt. # 17-2 at 7.) Gonzales's review of the phone did not reveal any "evidence that [] Skaggs sent Garcia any TikTok video from her work phone," and Skaggs told Gonzales "that

[3] Gonzales interviewed Skaggs, Guill, Mario Rodriguez, a Complex Manager at Frost, "and other members of Garcia's team" who witnessed or had knowledge of the events in question. (See Dkt. # 17-2 at 6–7.)

she did not know how to 'share' TikTok videos." (Id.) Gonzales and Garcia met to discuss Gonzales's findings about the TikTok video on November 15, 2023. (Id.; see Dkt. # 17-1 at 42.)

Then, on November 28, 2023, Garcia submitted another report to Gonzales. This time, Garcia alleged a Frost employee, Richard Gonzalez, had commented "'at least it was not breast milk' after Jennifer [Guill] was talking about being given a drink with the wrong flavored creamer." (Dkt. # 17-1 at 42; see id. at 44, 58; Dkts. ## 17-2 at 8; 19-1 at 6.) Garcia also contends that his report to Gonzales also described his "former Commercial Supervisor Irene Villareal taking an employee to lunch" for the express purpose of "speak[ing] negatively about me and encourage[ing] complaints against me" and "the Retail Processing Team being allowed to consume alcohol on company time." (Dkt. # 19-1 at 7.) In his deposition testimony, Garcia acknowledged that Guill had written him an email stating that she was "[p]ersonally . . . not in favor of having alcohol at a team member level for team builders and events." (Dkt. # 17-1 at 42.). Guill wrote that email, Garcia testified, *in response to an email from* Garcia to Guill earlier the same day asking, "[f]or today's team builder, are you okay with PC team members buying their own beer/liquor drinks as was done by [another] team during team builder event?" (Id. at 42–43.)

5. Garcia's 360 Degree Evaluation and Year-End Review

At some date before November 3, 2023, Frost management requested human resources personnel conduct a three-hundred-and-sixty degree evaluation ("the 360") on Garcia. (See Dkts. ## 17-2 at 9; 17-15.) The 360 ultimately included input from nineteen colleagues. (See Dkts. ## 17-2 at 9; 17-15.) On November 3, 2023, Gonzales shared her findings from the 360 via email with Kelley Terry ("Terry). (See Dkt. # 17-15.) In her email to Terry, Gonzales indicated that Garcia "can be very nice and personable" as well as "generous and compassionate with his team."

Gonzales documented interviewees' comments about Garcia's "good intentions," however they also expressed that "[they] do not believe that he has a full understanding of their job functions." (Id. at 2.) Feedback from Garcia's colleagues included that he "either doesn't understand Loan Operations and how his area interacts with theirs or he doesn't care about other areas" as well as descriptions of Garcias as "a Deer in Headlights when he is asked in more detail about the work in his area." (Id.) Several interviewees stated that he "goes in circles" when asked difficult questions and mentioned that he "is very pushy" and wants responses to his non-urgent inquiries immediately, even following staff into the men's room. (Id.)

The 360 also included feedback from Garcia's colleagues that indicated he neither sought feedback nor implemented that which colleagues or Frost management gave him. (See id. at 2–3.) Responses also reflected a pattern of Garcia "often ask[ing] the same questions that have already been discussed" in a meeting. (Id. at 3.) To explain this phenomenon, the 360 indicated that interviewees "believe [Garcia] isn't always engaged during [team] meetings, which causes him not to hear the discussion." (Id.)

The 360 concluded with a set of recommendations for Garcia. (See id.) These included (1) providing coaching to help Garcia "understand the importance of being mindful of others['] time and workloads"; (2) directing Garcia to develop "a better understanding" of other teams and Frost loan procedures; (3) placing him on another PIP because "[a]ll of the issues listed . . . were previously addressed in . . . [the] 2020 [PIP]"; and (4) "provide [Garcia]with a Staff Development Leadership Coaching." Id.; cf. Dkt. # 17-6 at 2–4 (the 2020 PIP, which outlines areas for Garcia's improvement that do, in fact, overlap with the 2023 360).)

Following the 360, Frost presented Garcia with a Final Performance Improvement Plan ("the Final PIP"). (See Dkts. ## 17-1 at 17; 17-2 at 11–12; 19-1 at 7.). He signed it on November 28, 2023. (Dkts. ## 17-1 at 17; 17-16 at 4.) Among other things, it noted the deficiencies Gonzales reported in her notes of the

360 evaluation and explained that "[o]n 10/30/2023, you shared an inappropriate joke during a Post-Closing team meeting" that "was sexual in nature and caused others in the meeting to feel embarrassed and uncomfortable." (Dkt. # 17-16 at 3.)[4] Regarding Garcia's performance, the Final PIP directed him to "create a formal plan of how to increase your knowledge of Commercial Post Closing processes." (Id.) Additionally, it directed that he share "the first steps of this plan . . . with management by December 12, 2023, two weeks from today's date." (Id.)

On December 12, 2023, Garcia submitted the first steps of his plan with Skaggs and Guill. (Dkt. # 17-17.) Garcia's email contained three one-line bullet points. (See id.) Skaggs and Guill then met with Garcia on December 13 to discuss his email. (Dkt. # 17-19 at 5.) Guill asked him whether "he felt that [his email] met the requirements outlined in the PIP and he replied yes." (Id. at 5–6.) He then supplemented the email with another note to Skaggs and Guill on December 19, 2023. (See Dkts. ## 17-1 at 20–21; 17-18.)[5]

In January 2024, Frost presented Garcia with his Year End Review, which covered his job performance for the 2023 calendar year. (See Dkt. # 17-19.)

---

[4] Garcia represents that nobody from Frost had "ever raised any such allegation . . . no investigation was conducted, no written documentation was created that was ever shown to [him], and no discipline . . . was imposed." (Dkt. 19-1 at 7.)

[5] Skaggs concluded that Garcia's December 19, 2023, supplemental email "still d[id] not represent a formal plan to increase his knowledge of the Commercial Post Closing processes." (Dkt. # 17-19 at 6.)

Skaggs completed the Year End Review and, along with Guill, met with Garcia to discuss it on January 12, 2024. (Id.)

6. 2024 FMLA Application and Termination

On November 28, 2023, Garcia requested a transfer to another Frost team. (See Dkts. ## 17-1 at 54–55; 17-2 at 12.) He did not submit any documentation concerning his disability, nor did he state that a transfer was necessary to accommodate his disability. (See Dkt. # 17-1 at 54–55.) Two weeks later, Gonzales informed Garcia that he could not be transferred "because it [was] Frost's standard practice that employees [like Garcia] subject to a Performance Improvement Plan cannot be transferred to other departments." (Dkt. # 17-2 at 12.) According to Garcia, he informed neither Skaggs nor Guill that he had a disability during the mid-to-late 2023 period where he was submitting internal complaints. (See Dkt. 17-1 at 54.) He had been diagnosed with psychiatric conditions on September 26, 2023. (See Dkt. # 17-23 at 7.) And, on or about January 3, 2024, when he applied for FMLA leave for himself, he did not indicate that his disability would impact his ability to perform his job functions. (See Dkt. # 17-23.) Rather, Garcia's healthcare provider, Psychiatric Nurse Practitioner Brandi Hrasdzira, indicated that Garcia "will be able to perform all job functions." (Id. at 9.)

Frost terminated Garcia on February 15, 2024. (See, e.g., Dkts. ## 17-1 at 8; 17-20.) Garcia stated that he was terminated because Frost "saw no improvements" since the corrective actions and guidance given in late 2023. (Dkt. # 17-1 at 36; see, e.g., Dkts. ## 17-15; 17-16; 17-17; 17-19.)

III. Procedural history

Plaintiff filed his Original Petition in the District Court of the 150th Judicial District in Bexar County, Texas, on January 13, 2025. (Dkt. # 1-4 at 2.) Defendant answered Plaintiff's petition in state court on February 14, 2025. (Dkt. # 1-6.) Then, on February 18, 2025, Defendant filed its Notice of Removal in this Court. (Dkt. # 1.) On June 15, 2026, Defendant filed a Motion for Summary Judgment on all Plaintiff's claims. (Dkt. # 17.) On July 9, 2026, Plaintiff filed a timely Response in Opposition.[6] (Dkt. # 19.) Then, on July 16, 2026, Defendant filed its Reply (Dkt. # 21).

---

[6] Simultaneously, Plaintiff filed Objections to Defendant's Summary Judgment Evidence. (Dkt. # 20.) On July 16, Defendant filed its Response in Opposition to Plaintiff's Objections alongside its Reply in Support of its Motion for Summary Judgment. (Dkt. # 22.) Plaintiff brings blanket hearsay objections to challenge the full suite of evidence that Defendant supplies in support of its Motion for Summary Judgment. (See Dkt. # 20 at 3–13.) The Court concludes that Plaintiff's objections are not meritorious. See, e.g., Maurer v. Independence Town, 870 F.3d 380, 384 (5th Cir. 2017) (per curiam) (recognizing that Rule 56(c) does not require summary judgment evidence to be "in the same form" that it would assume before a jury at trial—only that the evidence "*could* be presented in an admissible form at trial"); LSR Consulting, LLC v. Wells Fargo Bank, N.A., 835 F.3d 530, 534 (same); Little v. Republic Ref. Co., Ltd., 924 F.2d 93, 97 (5th Cir. 1991) (holding that employment discrimination cases, like Garcia's case here, "even an [employer's]

LEGAL STANDARD

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citation modified); see also Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.'" Nola Spice Designs, 783 F.3d at 536

---

incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" and "[w]e do not try in court the validity of good faith beliefs as to an employee's competence"). Accordingly, Plaintiff's objections are **OVERRULED**. (See Dkt. # 20.)

(quoting Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 718–19 (5th Cir.1995) (per curiam)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248). And "[a]n issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant. In reviewing the evidence, we must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence. Nall v. BNSF Ry. Co., 917 F.3d 335, 340 (5th Cir. 2019) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896 (5th Cir. 2002)). And while the movant must demonstrate the absence of a genuine issue of material fact, it does not need to "negate the elements of the nonmovant's case." Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)).

"When the moving party has met its Rule 56 burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010) (citation modified). Instead, "[t]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." Id. "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v. Hillstone Rest. Grp.,

Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)).

Additionally, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)). This means that "a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." Seigler v. Wal-Mart Stores Texas, L.L.C., 30 F.4th 472, 477 (5th Cir. 2022) (quoting Doe ex rel. Doe v. Dall. Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000) (citation modified)).[7]

## ANALYSIS

Defendant moves for summary judgment on all of Plaintiff's claims. (Dkt. # 17 at 5.) These include a claim of disability discrimination under the Texas

[7] The Fifth Circuit has identified this as the "sham-affidavit doctrine." Seigler, 30 F.4th at 472 (quoting S.W.S. Erectors, Inc. v. Infafax, Inc., 72 F.3d 489, 495 (5th Cir. 1996)). It has noted an exception to this rule whenever "a subsequent affidavit . . . supplements or explains, rather than contradicts, prior deposition testimony." Callahan v. Gulf Logistics, L.L.C., 456 F. App'x 385, 392 (5th Cir. 2011) (first citing Clark v. Resistoflex Co., 854 F.2d 762, 766 (5th Cir.1988); and then citing Kennett–Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir.1980)).

Commission on Human Rights Act ("TCHRA"), failure to accommodate under the TCHRA, sex discrimination under the TCHRA, retaliation under the TCHRA, and claims for both interference and retaliation under the Family and Medical Leave Act ("FMLA"). (Dkts. #1-4; 17-5 at 10–20.) Because Plaintiff's FMLA claims implicate this Court's federal question jurisdiction under 28 U.S.C. § 1331, it will first address those claims before turning to the TCHRA claims, which implicate the Court's discretionary supplemental jurisdiction. See 28 U.S.C. § 1367.

I. Federal Claims: FMLA Interference and Retaliation

"The FMLA generally provides for up to 12 weeks of leave in any 12-month period due to a serious health condition. 29 U.S.C. § 2612(a)(1)(D). Companies who employ 50 or more individuals within a 75-mile radius are subject to the FMLA's requirements. Campos v. Steves & Sons, Inc., 10 F.4th 515, 526 (5th Cir. 2021) (first citing 29 U.S.C. § 2612(a)(1)(D); and then citing id. § 2611(2)(B)(ii)). Further, an employee like Garcia who requests FMLA leave can only be eligible if he worked more than 1,250 hours with his employer during the prior 12-month period. See 29 U.S.C. § 2611(2)(A)(ii).[8] "The FMLA creates two types of protections—entitlement rights (sometimes also called prescriptive rights) and proscriptive rights." Campos, 10 F.4th at 526 (citing Mauder v. Metro. Transit

[8] Here, Frost notified Garcia that he was eligible for FMLA leave. (See Dkt. # 17-1 at 31–34.)

Auth., 446 F.3d 574, 580 (5th Cir. 2006)). Garcia asserts that Frost violated both sets of rights, so the Court will consider both in turn. (Dkt. # 1-4 at 9–10; See Dkt. # 1 at 3.)

As a threshold matter, Defendant avers that Garcias was never denied any FMLA to which he was entitled. (Dkt. # 17 at 22.) In fact, he was never denied FMLA leave. (See Dkt. # 17-1 at 36.) Rather, Frost points to Garcia's 2024 FMLA request for himself, which it claims was not denied but delayed because Garcia did not support this leave request with adequate supporting medical documentation. (See Dkt. # 17 at 22.)

Garcia does not directly counter Plaintiff's argument. Instead, he argues that his 2024 termination reflects Frost's "approve-then-punish" rather than "approve-and-accept" attitude toward Garcia's various FMLA applications and approvals. (Dkt. # 19 at 18.) Garcia attempts to make hay of the coincidence between the timing of the Final Written Warning on February 28, 2023, and the fact that Frost acknowledged his second FMLA leave request to care for his mother the week prior. (See id.) He also points to a "2024 sequence" that is "tighter still" and, as Plaintiff puts it, probative of Frost's retaliation for taking FMLA. (See id.) After applying for FMLA leave on January 3, 2024, Garcia observes that his 2023 Year End Review issued, which rated him a 1.97 of 5.0, issued eight days later.

(Id.) This, he claims, is not coincidence but evidence of Frost's Retaliation. (See id.)

Frost replies that Garcia's Response attempts to immunize himself from "Frost's ongoing disciplinary processes" investigating and correcting Garcia's conduct, "which were independently supported by legitimate contemporaneously recorded documentation." (Dkt. # 21 at 10–11.) Frost also emphasizes how Garcia's own deposition testimony undercuts his ability to recover on FMLA retaliation as a matter of law. (See id.) It references how Garcia was "not sure" whether the supervisors who decided to terminate him, Skaggs and Guill, had knowledge of his January 3, 2024, FMLA leave request. (Id. at 10; Dkt. # 17-1 at 36.) Relying on Lyons v. Katy Independent School District, 964 F.3d 298, 305 (5th Cir. 2020) and Amedee v. Shell Chem., L.P., 953 F.3d 831, 836 (5th Cir. 2020), Defendant repeats the Fifth Circuit's rule of decision that "employees cannot immunize themselves from legitimate termination by taking [or requesting] FMLA leave." (Dkt. # 21 at 10 (alterations in original) (quoting Lyons, 964 F.3d at 305).)

A. FMLA Interference

A prima facie case of FMLA interference requires an employee to show that "(1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his

intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA." Caldwell v. KHOU-TV, 850 F.3d 237, 245 (5th Cir. 2017). "The employee also must show that the violation prejudiced him." Id. (citing Acker v. Gen. Motors, L.L.C., 853 F.3d 784, 788 (5th Cir. 2017)).

Here, Garcia's interference claim fails as a matter of law because he cannot establish a prima facie case of FLMA interference. See Caldwell, 850 F.3d at 245. To be sure, it is undisputed that Garcia was an eligible employee, Frost was subject to FMLA requirements, and Garcia gave Frost proper notice of his intention to take FMLA leave. However, the Fifth Circuit requires a plaintiff like Garcia to establish a primary facia case for *all* five elements. See id. Here, Garcia has made no showing that (1) he supplied enough supporting medical information with his January 3, 2024, request for personal FMLA leave and (2) Frost actually denied him FMLA benefits. See Caldwell, 850 F.3d at 245. Here, because Garcia bears the burden of proof at trial, Frost "may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial" on the FMLA interference claim. Nola Spice Designs, 783 F.3d at 536 (citation modified).

As mentioned above, Frost neither actually nor constructively denied Garcia's January 3, 2024, request for FLMA leave. (Dkt. # 17-23 at 10.) After Frost pointed to the absence of any evidence supporting Garcia's contention that he was denied FMLA leave (Garcia confirmed that Frost never denied him FMLA leave during his deposition testimony (see Dkt. # 17-1 at 32)), Garcia has not introduced any summary judgment evidence to create a genuine issue of material fact on this issue. (See Dkt. # 19; see also Dkt. # 19-1 ("It is true, as I testified at my deposition, that no one at Frost ever expressly told me that I could not apply for or take FMLA leave, and that Frost never issued a written denial of my application.").) His assertion by affidavit that Frost terminated his employment "forty-three days after [his application] . . . so that [he] never received the intermittent leave [his] provider had certified as medically necessary" is inadequate. (Dkt. # 19-1 at 10) It lies in the heartland of the "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation" that the Fifth Circuit has instructed "are not sufficient to defeat a motion for summary judgment." Renda Marine 667 F.3d at 655 (citation modified); see Seigler, 30 F.4th at 477 ("[A] nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." (citation modified)).

Because Frost never denied Garcia's January 3, 2024, FMLA request, Frost is entitled to judgment on the FMLA interference claim as a matter of law.

See Caldwell, 850 F.3d at 245. Additionally, the circumstances of timing are insufficient to sustain such a claim at this stage of the litigation. See Amedee

B. FMLA Retaliation

"The FMLA prohibits retaliation against those who exercise their FMLA rights." Campos, 10 F.4th at 527 (citing Mauder, 446 F.3d at 580). "A prima facie showing of FMLA retaliation requires that a plaintiff show: (1) 'he was protected under the FMLA;' (2) 'he suffered an adverse employment action;' and (3) 'he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he sought protection under the FMLA.'" Id. (quoting Mauder, 446 F.3d at 583 (internal citation omitted)); cf. Hunt v. Rapides Healthcare Sys., 277 F.3d 757, 768 (5th Cir. 2001). The last element requires the Plaintiff supply proof of a causal link. See Acker, 853 F.3d at 790. The Fifth Circuit applies the McDonnell-Douglas burden-shifting framework to FMLA retaliation claims on summary judgment. See Amedee, 953 F.3d at 835. "Once an employee propounds a prima facie case of interference or retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. (quoting Richardson v. Monitronics Int'l, Inc., 434 F.3d 327, 331 (5th Cir. 2005)). "Thereafter, 'the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for

discrimination." Id. (quoting Tatum v. S. Co. Servs., Inc., 930 F.3d 709, 713 (5th Cir. 2019)).

1. Prima Facie Case

There is no dispute that Plaintiff was protected under the FMLA. Nor does Defendant dispute that Plaintiff suffered an adverse employment action when he was terminated. Instead, Defendant disputes the third element of Plaintiff's prima facie case—whether there is a causal connection between his FMLA leave and his termination. (Dkts. ## 17 at 22–24; 21 at 10.)

At this stage, it is unlikely that Plaintiff has established a prima facie case because of his own admissions that he had been subjected to disciplinary actions for performance issues that were documented more than three-years prior to his termination by a different supervisor and were recurring. (See Dkt. # 17-1 at ; (Compare Dkts. ## 17-6 (outlining reasons why Watson placed Garcia on the 2020 PIP), with # 17-15 (identifying the same deficiencies in Garcia's performance from the 2020 PIP as reasons why Frost HR and management believed the Final PIP was appropriate.)

2. Legitimate, Non-Retaliatory Reason

The Court accepts, arguendo, that Plaintiff has made a prima facie case. However, it finds that Defendant has rebutted Plaintiff's prima facie case by identifying several legitimate, non-retaliatory reasons for its termination decision.

See Amedee, 953 F.3d at 835. According to Frost, it terminated Garcia for his poor performance in his job function and general lack of improvement across several areas following multiple corrective actions that spanned a period exceeding three years. (See, e.g., Dkts. ## 17; 17-1 at 36; 17-6 (the 2020 PIP); 17-9 (Final Written Warning); 17-10 (2023 Informal Mid-year Review); 17-15 (the 360 findings); 17-16 (Final PIP).) At this point, Frost's burden "is one of production, not persuasion, and it involves no credibility assessment." Musser v. Paul Quinn Coll., 944 F.3d 557, 561 (5th Cir. 2019) (quotation omitted). Indeed, the Court is forbidden from assessing the credibility of Defendant's (or Plaintiff's) evidence on summary judgment. See Nall, 917 F.3d at 340. The Fifth Circuit has been clear that "job performance is a legitimate, non-retaliatory reason for termination." Id. (cleaned up). Defendant has thus satisfied its burden. [9]

---

[9] The Court also notes that Frost did not move to dismiss under Rule 12(b)(6). Had it done so and the Court applied the Rule 12 standard, it is likely that the Court would have denied such a motion because the timing of Garcia's dismissal permits such an inference. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (first quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); and then quoting id. at 556)). With the benefit of summary judgment record, however, it is clear that Frost had numerous non-pretextual reasons to discharge Frost other than any alleged issues with his 2024 FMLA application. Cf. Lanier v. Univ. of Tex. Sw. Med. Ctr., 527 F. App'x 312, 316 (5th Cir. 2013) (holding that FMLA permits

3. Pretext

Because Frost furnished legitimate reasons for its decision to terminate Garcia, the burden shifts back to Garcia to show that Frost's stated reasons are pretext for retaliation. To avoid summary judgment, Plaintiff must show that there is a "conflict in substantial evidence" on this issue. Musser, 944 F.3d at 561 (quotation omitted). "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. at 561–62 (quotation omitted).

Given Garcia's evidence, the Court must determine whether Garcia has raised a fact issue on pretext by producing evidence that could support a finding that Frost would not have terminated Plaintiff in the absence of his taking FMLA leave. The Court finds that he has not. After considering Garcia's evidence, the Court is left only with the temporal proximity between Garcia's January 3, 2024, application for FMLA leave and his February 15, 2024, termination. (See Dkts. ## 17-20; 17-23.) This evidence by itself is not sufficient to demonstrate that Defendant's stated reasons for his termination were pretextual or that FMLA retaliation was the motivating factor in Plaintiff's discharge. As

---

employers' inquiries to gather additional information about an employee's request (first citing Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir. 1995); and then citing Satterfield v. Wal–Mart Stores, Inc., 135 F.3d 973, 980 (5th Cir. 1998) (footnotes omitted)).

Frost succinctly phrased the problem in its reply, "Plaintiff's FMLA application did not suspend Frost's ongoing disciplinary processes, which were independently supported by legitimate contemporaneously recorded documentation." (Dkt. # 21 at 10–11.)

Accordingly, based on the summary judgment record, the Court finds that Plaintiff has failed to provide sufficient evidence of pretext on the part of Defendant to survive summary judgment. Plaintiff's claim for FMLA retaliation is dismissed with prejudice.

II. State-law claims

Having disposed of the claims that provide for this Court's original jurisdiction under 28 U.S.C. § 1331, the Court now turns to Garcia's state-law claims, which invoke this Court's supplemental jurisdiction under 28 U.S.C. § 1367. The Fifth Circuit has instructed that district courts may decline to exercise supplemental jurisdiction upon consideration of four factors. Enochs v. Lampasas Cnty., 641 F.3d 155, 159 (5th Cir. 2011) These factors include "(1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction." Id.; see also 28 U.S.C. § 1367(c). At common law, the "general rule is to dismiss state claims when the federal

claims to which they are pendent are dismissed," although that rule is "neither mandatory nor absolute." Enochs, 641 F.3d at 161 (citation modified). Thus, courts must "balanc[e] the values of economy, convenience, fairness, federalism, and comity." Parker & Parsley, 972 F.2d at 585 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

Here, the Court finds that the four remaining state claims predominate over the two federal claims that the Court has dismissed. See Enochs, 641 F.3d at 159. Although there are colorable arguments that it would be most convenient for the Court to dispose of the claims in the instant Order, the common law factors militate in favor of dismissal. Cf. Johnson v. Smith, No. CV 24-170, 2024 WL 5010217, at *12 (E.D. La. Dec. 6, 2024), aff'd, No. 24-30791, 2025 WL 3092772 (5th Cir. Nov. 5, 2025) (analyzing the common law factors and observing that "[j]udicial economy would not be undermined as this Court has not made any ruling on state law or affecting the state-law claims" and "it is not unfair for these parties to litigate Louisiana-law claims in Louisiana state court" (citing Enochs, 641 F.3d at 160)). Like the court found in Johnson, so too here: judicial economy, fairness, and comity all support the dismissal Garcia's Texas law claims without prejudice to refiling. See id. This is so notwithstanding the fact that Texas courts have indicated that the law governing claims under the TCHRA is "identical" to Title VII. See, e.g., Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 403 n.2

(5th Cir. 1999). But cf., e.g., Oldenburg v. Univ. of Tex. at Austin, No. 1:18-CV-968-LY, 2020 WL 3415879, at *3 (W.D. Tex. June 22, 2020) ("Texas law departs from federal law in the final step of the McDonnell Douglas analysis, however, as Texas allows the plaintiff to show pretext by presenting evidence of a mixed motive, as opposed to the federal but-for causation requirement." (citing Reed v. Neopost USA, Inc., 701 F.3d 434, 439 (5th Cir. 2012)), report and recommendation adopted sub nom. Oldenburg v. Univ. of Tex. at Austin & Pres. Gregory Fenves, No. 1:18-CV-968-LY, 2020 WL 13610379 (W.D. Tex. July 8, 2020), aff'd sub nom. Oldenburg v. Univ. of Tex. at Austin, 860 F. App'x 922 (5th Cir. 2021).

At bottom, the TCHRA remains a creature of Texas law. Accordingly, the salience of the Supreme Court's sixty-year-old warning endures: "Needless decisions of state law should be avoided . . . as a matter of comity." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); see also Royal Canin U. S. A., Inc. v. Wullschleger, 604 U.S. 22, 32, 40 (2025) (construing 28 U.S.C. 1367(c) and citing Gibbs for similar propositions).

CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 25), and Plaintiff's FMLA claims are **DISMISSED WITH PREJUDICE**. Plaintiff's claims arising under Texas law are

**DISMISSED WITHOUT PREJUDICE** because the Court declines to exercise supplemental jurisdiction following its dismissal of Garcia's FMLA claims, which provided the basis of its original federal question jurisdiction. The Clerk's Office is **INSTRUCTED** to **ENTER JUDGMENT** and **CLOSE THE CASE**.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, October 15, 2026.

____________________________________
David Alan Ezra
Senior United States District Judge